GEORGE MASAKIYO GUSHIKEN AND TSURUYO GUSHIKEN *v.* SHELL OIL COMPANY.

Nos. 2414 AND 2415.

ARGUED MARCH 19 AND 20, 1940, AND
SUBMITTED MARCH 20, 1940.  DECIDED APRIL 26, 1940.

COKE, C. J., PETERS AND KEMP, JJ.

OPINION OF THE COURT BY KEMP, J.

This is an action in assumpsit by George Masakiyo Gushiken and Tsuruyo Gushiken, husband and wife, against Shell Oil Company for rent alleged to have accrued under a lease of a service station owned by the plaintiffs and by them leased to the defendant, the lease being for a term of three years commencing January 6, 1933, and ending the 4th (*sic*) day of January, 1936, the lessee having the right to extend the term for an additional two years by giving lessors written notice thereof at least thirty days prior to the expiration of the three-year term. The lease also provides for an automatic extension of one year after the expiration of the two-year extension unless terminated by one of the parties giving to the other written notice of at least one month prior to the expiration of the then current year of his or its desire and intention to terminate the lease at the end of said year. The defendant did, by written notice to the plaintiffs, exercise its right to have the lease extended for an additional two years and neither party notified the other within said extended period that it desired and intended to terminate the lease at the end of said two-year period. The lease was therefore in effect for an additional year after the expiration of the two-year extension. This suit was commenced July 7, 1938, while the lease was still in effect.

The rent reserved in the lease is as follows: "The Lessee shall pay to the Lessor as rental for said premises a sum equal to 1/2 cent for each gallon of gasoline delivered by the Lessee to the demised premises and sold therefrom

during the calendar month for which payment is to be made. Said rental shall be payable in cash or by credit as and when said gasoline is sold or on the 20th day of the calendar month next following the month for which payment is to be made, as Lessee may from time to time elect."

The purpose of the lessee in leasing the demised premises is set forth in the lease as follows: "It is mutually understood that the Lessee's purpose in entering into this lease is to secure the representation and sale of its products upon and from the demised premises, and the Lessor covenants and agrees not to sell, store, offer or advertise for use or sale upon or from the adjoining premises owned or held by the Lessor, or on or from any premises, owned or held by the Lessor in the immediate vicinity of the demised premises, nor to suffer or permit, by lease, license, easement or otherwise, any other person or persons to sell, store, offer or advertise for use or sale thereupon or therefrom any gasoline, kerosene, distillate or other motor vehicle or internal combustion engine fuel, lubricating oils, greases or other petroleum products, while the Lessee, its tenants, licensees, successors or assigns shall maintain and operate an automobile supply or service station upon the demised premises; provided, however, that nothing herein contained shall prohibit the sale of lubricating oils and greases upon the said adjoining premises while and so long as not less than 100% in quantity of such products shall have been purchased from and supplied by the Lessee herein for resale from said premises."

The lease above described is hereinafter termed "the lease."

The lease and another document termed "lease and consignment contract" were executed simultaneously. The latter is hereinafter termed "the sublease." By the terms of the sublease Shell Oil Company sublet to George Masakiyo Gushiken, one of the lessors named in the lease, the

same premises by the lease demised to it. The term of said sublease is for a term two days less than the life of the lease.

In the sublease the sublessor is referred to as "the company" and the sublessee is referred to as "the agent." For convenience we shall use the same nomenclature. The rent reserved in the sublease is as follows: "The Agent agrees to pay the Company rental therefor at the rate of $1.00 per month, payable monthly in advance on the first day of each month; to reimburse the Company for any and all insurance carried by the Company with respect to the demised premises during the time this Sublease remains in effect; and not to sublease the demised premises or any part thereof without the written consent of the Company. The Agent declares that all the improvements and equipment on or forming a part of said premises are in good and safe condition and repair and the Agent, during the life of this Sublease, shall keep, and at the expiration of this Sublease, shall surrender the same in good and safe condition and repair, all at the Agent's expense, reasonable use and damage by the elements excepted. During the life of this Sublease the Agent shall pay before delinquency all taxes on said premises, improvements and equipment, and shall pay at maturity for all water, gas, heat, electricity and other service used upon said premises, and shall not commit or permit any act or create any lien which will in anywise impair the Company's interest or title thereto, and shall keep the premises in neat and clean condition and permit them to be painted with the Company's established colors. This Sublease is subject to all the terms, covenants and conditions of said Indenture of Lease."

Other pertinent provisions of the printed sublease are as follows: "3. The Agent shall maintain and operate on said premises a service station equipped and operated

in full compliance with all the laws and regulations effective at that place, said service station and equipment to be used solely for storing and dispensing gasoline and other motor fuel of the Company and oils and greases supplied by the Company. The Agent shall maintain upon said service station a sign displaying conspicuously the name of the Agent or of the service station, together with the words 'AUTHORIZED FILLING STATION FOR SHELL PRODUCTS.' The Company shall have the right to inspect said service station at all times. 4. The Company shall maintain on consignment in the custody of the Agent at said service station such quantities of gasoline as the Company may determine from time to time to be sufficient to meet the requirements for sales at said service station. All such gasoline so maintained on consignment in the custody of the Agent is to be and remain the property of the Company until sold as hereinafter provided, and thereafter the proceeds of all such gasoline are to be and remain the property of the Company until fully accounted for and paid as hereinafter provided. The Agent shall be responsible to the Company for the full amounts of gasoline delivered into the custody of the Agent. The Agent shall be required to account to the Company for any such gasoline lost or damaged and to pay the Company an amount equal to the sales price thereof less commissions unless the Agent can furnish clear and satisfactory proof that the loss or damage was caused by accident without failure on the part of the Agent to exercise the due diligence required of him. During the term of this Agency, upon demand and in any event upon the termination of this Agency, the Agent shall deliver to the Company any and all gasoline of the Company which may then be in the custody of the Agent on consignment. Should the Company be delayed or prevented in the performance of any of its covenants

hereunder by act of God, accident, fire, earthquake, insurrection, Governmental action, strike, total or partial failure of transportation facilities or supplies, or by any cause whatsoever beyond its reasonable control, whether of a similar or dissimilar class, the performance of such covenant may be suspended while the Company is so prevented or delayed without liability on the part of the Company on account thereof, but the Agent in such event shall be entitled to obtain from other sources such gasoline as may be required for sale at said service station during such period, no such gasoline to be sold, however, except in containers or through pumps conspicuously marked to indicate such gasoline to be of other manufacture than the Company's. * * * 6. The Company shall deliver into the custody of the Agent, without cost to the Agent, all gasoline consigned to the Agent. Thereafter the Agent shall bear and pay all expenses of storage, handling, sale and distribution of said gasoline and all expenses incident thereto or to the accounting therefor, and all taxes and assessments which may be levied thereon while held on consignment. The Agent shall keep a careful and accurate record which shall be open to the inspection of the Company, showing the amounts of all gasoline consigned to the Agent, and all sales thereof, and if the Company provides forms and books for such records, such forms and books shall be used. The Agent shall account to the Company for sales of all gasoline consigned to the Agent on demand, or at such regular intervals as may be indicated by the Company for that purpose, and shall furnish to the Company such deposit or other security as the Company may require to insure the proper accounting for all gasoline consigned to the Agent by the Company. 7. For each gallon of each grade of gasoline delivered by Company to Agent on consignment which shall be sold and accounted for by Agent as herein re-

quired, Company agrees to pay Agent, a commission which, after adding thereto the amount per gallon of any rental and/or other credit allowed by Company to Agent under the provisions of this or other existing agreement concerning said property, shall equal the aggregate of the commission and the amount per gallon of any rental and/or other credit generally allowed by Company on such grade of gasoline, at time of delivery hereunder, to Company agents generally selling substantially the same quantities of gasoline as Agent in the vicinity of said Service Station; it being agreed that the aggregate of said commission and the amount per gallon of said rental and/or other credit shall at all times be as much per gallon as the aggregate of the commission and the amount per gallon of rental and/or other credit generally allowed for similar grades of gasoline by the majority of the five major marketing companies to agents generally selling substantially the same quantities of gasoline as Agent in the vicinity of said service station at time of delivery. In the case of rentals or other credits not fixed on a per-gallon basis, the amount thereof per gallon for the purposes hereof shall be determined by dividing the whole amount thereof for the particular month or other specified period by the number of gallons of all grades of gasoline sold in the same period at the Service Station to which such rental or other credit is applicable. The five major marketing companies shall be the companies, including the company herein named, which shall have sold to or through retail service stations the largest volume of gasoline in the state according to tax returns during the preceding calendar month. * * * 11. During the life of this agreement the Agent shall exclusively buy from the Company and keep in stock for sale at said Service Station under the Company's trade marks and trade names adequate quantities of such lubricating oils, greases and other petroleum products

as are marketed by the Company. The Agent shall pay for the same the Company's wholesale prices unless otherwise stipulated by separate written contract; payment to be made cash on delivery or subject to such credit as the Company may allow. 12. During the continuance of this agreement the Agent shall not sell and shall not suffer or permit to be sold on or from any premises owned, leased or controlled by the Agent within 200 yards of the aforesaid premises, any petroleum products except such as may be supplied by and acquired from the Company."

Before the sublease was executed there was attached to it a typewritten document, referred to by the parties as a "rider," which reads as follows: "The Company and the Agent mutually agree to waive consignment deliveries with the understanding that the Company shall have the right to reinstate said consignment deliveries at its option." For convenience we shall also refer to said document as "the rider."

Although the sublease designates George Masakiyo Gushiken as the sublessee and terms him "the agent," both he and his wife executed it and thereafter so dealt under it as to justify the conclusion that it was their joint contract.

The defendant interposed a general denial to the complaint and trial was had without a jury. At the conclusion of the trial the court orally stated its conclusions and thereafter filed a written decision setting forth findings of fact and conclusions of law which, omitting formal parts, is as follows: "In the trial the defendant did not deny or attempt to disprove any of the allegations of the plaintiffs' declaration, except the allegation of non-payment of rent and offered evidence in support of what amounted to a plea or defense of payment of all rents due under the said lease for the entire period covered by the declaration.

"The plaintiffs and the defendant introduced evidence, both oral and documentary, and both parties having rested, the cause was submitted to the Court for decision.

"While there is sharp conflict between the parties as to the legal effect of the evidence so introduced there is little, if any, conflict in the testimony itself, other than in the expressions of opinion. No question of credibility arises because the Court is of the opinion that every witness testified to what he or she believed to be the truth.

"Since the plea or defense of payment casts the burden of proof as to that issue on the defendant, the Court has considered the evidence from that angle.

"After giving full consideration to all of the evidence, oral and documentary, the Court is of the opinion and so decides that the defendant has sustained the burden of proof thus cast on it in respect to the period covered by the declaration beginning with January 6, 1933, and ending with February 26th, 1935, and has failed to sustain that burden in respect to the remainder of the period covered by the declaration, namely, from February 27, 1935 to and including June 30, 1938.

"Credit memoranda introduced in evidence by the defendant affirmatively show, in the opinion of the Court, that all rentals were paid for the period commencing with the date of the lease, January 6, 1933, and ending February 26, 1935. Credit memoranda introduced by the defendant for the period from February 26, 1935 to May 1, 1937, do not show the payment of any rent, but such credits are ascribed to and accounted for as arising from other concern. After May 1, 1937, no credits were given or payments made by the defendant to the plaintiffs, and there is no evidence of payment of rent under the Lease after February 26, 1935, other than testimony of defendant's agents that the price at which Shell Oil Company sold gasoline to the plaintiffs, was intended by the

Company to settle the rentals accruing under the lease from month to month. There is no satisfactory evidence that such a belief on the part of the Company's agents was made known to the plaintiffs until after they had made demand for unpaid rentals and, upon the other hand, there is evidence clearly showing that the Shell Oil Company's selling price for gasoline delivered to this service station was during all the period last referred to (except from February 26, 1935, to May 1, 1937, when the price was increased one cent a gallon for the purpose of creating a credit fund for the benefit of Gushiken's Service Station) the same as the open cash price available to all distributors, as maintained by all of four wholesale gasoline importers and dealers operating in Hilo during said period.

"The court concludes as a matter of law that the plaintiffs are entitled to judgment, pursuant to the prayer of their declaration, in an amount equal to one-half cent per gallon for every gallon of gasoline delivered to and sold from the premises leased, which was occupied by Gushiken Service Station, month by month, after February 26th, 1935, to and including June 30th, 1938, together with legal interest on the monthly rent from the 20th day of each month following said delivery and sale, and together with attorneys' costs and costs of court."

Both plaintiffs and defendant have alleged exceptions to the decision and judgment in so far as they are unfavorable to their contentions.

Defendant's exceptions which have been urged in this court all relate to the finding by the court that the rent from February 25, 1935, to and including June 30, 1938, had not been paid and to the judgment entered thereon.

Plaintiffs' exceptions which have been urged in this court all relate to the finding by the court that rent from January 6, 1933, to February 26, 1935, had been paid and to the judgment entered thereon.

It is not within our province to determine the preponderance of the evidence. If there is substantial evidence, more than a mere scintilla, to support the verdict of a jury or the findings of fact by the court in a jury-waived trial, such verdict or finding is conclusive on this court. (*Paki* v. *Saffery,* 29 Haw. 250.)

Before examining the evidence to determine whether or not there is substantial evidence, more than a mere scintilla, to sustain the findings excepted to, it is necessary for us to determine what the contract of the parties was as set forth in the lease and sublease. But for the rider above quoted the terms of the contract would be clear and unambiguous. The existence of the rider interjects an element of uncertainty into their meaning. Paragraph 3 of the sublease above quoted bound the agent to maintain and operate on the demised premises a service station solely for the storing and sale of the company's gasoline and other products. The rider very clearly did not relieve the agent of the obligation imposed upon him by paragraph 3. Paragraph 4 of the sublease as printed obligated the company to "maintain on consignment in the custody of the Agent at said service station such quantities of gasoline as the Company may determine from time to time to be sufficient to meet the requirements for sales at said service station." The rider very clearly relieved the company of the obligation which would have been imposed upon it by paragraph 4 and deprived the agent of the benefits which he would have received from such consignment deliveries. Paragraph 7 of the sublease, as printed, clearly defined the compensation which the agent was to receive for selling gasoline consigned to him by the company. The vital question in the construction of the contract of the parties is, what effect did the rider have upon the provisions of paragraph 7 of the sublease? Plaintiffs

argue that the effect of the rider was to eliminate entirely from the sublease all provisions relative to consignment deliveries and particularly paragraphs 4 and 7.

The defendant admits that the effect of the rider was to relieve the company of any obligation to make consignment deliveries of gasoline to the agent, as required by paragraph 4, but argues that the only effect it had upon paragraph 7 was to substitute for the words "on consignment" the words "for cash or on credit" and that the commission of the agent, spoken of in said paragraph, would be the difference between the wholesale and retail price of gasoline and that the rental of one-half cent per gallon of gasoline provided for in the lease would be included in and discharged by the profit allowed the agent on the gasoline sold at the retail price which the company had reserved the right to fix. It was also argued that so long as the profit was equal to or exceeded one-half cent per gallon on gasoline the rent reserved in the lease was discharged. If defendant's contention is adopted, the plaintiffs admit they have no case. The adoption of defendant's contention as to the effect of the rider would require a practical rewriting of paragraph 7. On the other hand, if plaintiffs' contention is adopted and paragraphs 4 and 7 are eliminated, the remaining provisions of the contract, without any alteration, are sufficient to prescribe the terms upon which the company would supply the gasoline as well as other products to enable the agent to carry on the business which he obligated himself to conduct on the demised premises.

With the consignment provisions eliminated the obligations of the agent would be: To pay the company a rental of one dollar per month and assume other obligations set forth in paragraph 1 of the sublease; to maintain and operate on the demised premises a service station solely for storing and selling gasoline and other products of the

company, to be supplied by it (para. 3); to buy for resale thereon exclusively from the company adequate quantities of lubricating oils, greases and other petroleum products as are marketed by the company and pay for the same the company's wholesale prices in cash on delivery or upon such credit as the company may allow (para. 11); to refrain from selling and permitting to be sold from any premises owned, leased or controlled by the agent within 200 yards of the demised premises any petroleum products except such as may be supplied by and acquired from the company (para. 12).

Under the same circumstances the obligations of the company would be: To pay the rent of one-half cent per gallon of gasoline delivered to and sold on the demised premises; to sell to the agent at its wholesale price for cash or credit lubricating oils, greases and other petroleum products in sufficient quantities to supply the agent's trade.

Had the printed contract been executed without the rider, paragraph 11 would have had no reference to the terms upon which the parties were to deal in gasoline because of the special provisions contained therein for the marketing of gasoline, but with the special provisions for the marketing of gasoline eliminated, paragraph 11 would remain and would .clearly define the terms upon which gasoline would be supplied by the company to the agent. It is common knowledge that gasoline is a petroleum product. Paragraph 11 obligated the agent to buy exclusively from the company adequate quantities of lubricating oils, greases and "other petroleum products" to supply his trade and pay therefor the wholesale price in cash on delivery or subject to such credit as the company might allow.

Strictly speaking, the question presented by the rider is not one of waiver but one of interpretation of the agreement of the parties as integrated by them. For the pur-

pose of expressing the agreement of the parties a printed document, prepared by the company, was used which, had it been executed without alteration, would have provided for the sale by the agent of gasoline consigned to him by the company upon terms therein set forth and for the sale by the agent of lubricating oils, greases and other petroleum products sold to him by the company for cash upon delivery or upon such credit as the company might allow. But it is apparent from the language of the rider that the parties did not agree to deal in gasoline on the terms contained in paragraphs 4 to 7, inclusive, of the printed document, all of which relate to consignment deliveries, and consignment deliveries were, according to the language of the rider, waived, *i.e.*, were not to become a part of the contract. All other provisions of the printed document remained intact, including paragraph 11, prescribing the terms upon which the company would supply the agent with certain products necessary to enable him to comply with his obligation under paragraph 3, to maintain and operate a service station on the demised premises solely for storing and dispensing gasoline and other motor fuel, oils and greases. Giving to the language of paragraph 11 its ordinary meaning it includes gasoline. Immediately upon the execution of the sublease, we find the agent buying from the company gasoline, sometimes for cash upon delivery and sometimes on credit allowed by the company. This is in accord with the provisions of paragraph 11. However, in an attempt to prove that the profit which the agent would make on the sale of a gallon of gasoline purchased by him was in fact a commission within the meaning of that word as used in paragraph 7 of the sublease, the defendant produced evidence to the effect that in the oil industry the word "commission" is used in referring to the profit a service station makes on the sale

of a gallon of gasoline. While it is sometimes permissible to ascribe to words a meaning other than their normal meaning, the rule is of limited application.

"The many expressions in the cases which assert that the normal meaning will be given to language and which assert that if language is clear and unambiguous there is no room for interpretation, though they may go too far for accuracy, at least indicate that the law is not likely to adopt the private meaning of the parties as the ultimate test for the interpretation of their written contracts. Certainly where the law requires a contract to be in writing, the requirement must be regarded as demanding a standard which, so far as the ambiguity of language permits, will furnish to the court evidence of the transaction in a form not wholly dependent for its meaning on the ideas of the parties to it." 3 Williston, Contracts (rev. ed.) § 611. The contract in question is one which the law requires to be in writing. (R. L. H. 1935, § 3900.) If the parties had intended that the provisions of paragraph 7 were to be rewritten so as to make the profit made by the agent on gasoline sold to him by the company subject to the provisions of said paragraph, it would have been very easy to have so provided in the rider. Both the rider and the printed document were prepared by the company. "Since one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity of language are resolved in favor of the latter." 3 Williston, Contracts (rev. ed.) § 621.

Had the printed contract been executed without the rider and the parties thereafter agreed to modify it, using exactly the language of the rider, we would have a typical case of waiver. A waiver is defined as a voluntary abandonment or surrender by a capable person of a right known by him to exist with the intent that such right shall be

surrendered and such person deprived of its benefits. (67 C. J. 291; *Northwestern F. & M. Ins. Co.* v. *Pollard,* 74 Mont. 142, 238 Pac. 594.) The principal benefits which consignment deliveries would have enabled the agent to enjoy were commissions on sales and freedom from financial obligation for the value of the gasoline prior to its sale by him. By voluntarily surrendering the right to have gasoline delivered on consignment, the agent was very clearly deprived of those benefits. The principal benefits which such deliveries would have enabled the company to enjoy were continued ownership of the gasoline until sold by the agent, its right to have the rent reserved in the lease included in the commission allowed the agent and its obligation in that regard discharged by the allowance of the commission. By analogy, the execution of the contract as altered by the rider should have the same effect as is attributed to a waiver. Plaintiffs' argument assumes that the company was bound to sell them gasoline at the same price it sold to other dealers. By the provision of paragraph 11, which in our opinion governs, the agent is required to buy at the company's wholesale price. There is nothing requiring the price to be the same to all dealers. The court apparently construed the company's wholesale price to mean the posted wholesale price, although there is no direct conclusion to that effect in its decision. We think the conduct of the parties furnishes substantial evidence to support that construction. For a period of about two years the company gave to all its customers a rebate of one cent per gallon on all gasoline purchased at the posted wholesale price. Where there were charge accounts the rebate was made by passing a credit to the debtor. But it does not appear that there was any legal obligation to give the rebate, and at times the credit memorandum issued to the plaintiffs

stated that one-half cent of the one-cent credit was in payment of rent for a certain month. At other times the credit memorandum was not so specific but there was evidence sufficient to justify the conclusion that during the period in question the credit was so applied. By finding that the rent was paid during the time the company was giving a rebate to all of its customers who purchased gasoline at the posted wholesale price, the court must have rejected plaintiffs' argument that during said time the rent was paid with their own money. The rebate having been given without any legal obligation to give it, the money did not belong to the plaintiffs and the company could use it for whatever purpose it chose.

There is no contention that consignment deliveries were at any time restored and it is conceded that, throughout the period covered by the suit, gasoline was purchased by the agent from the company, sometimes for cash and sometimes on credit, and resold by the agent on the premises at prices fixed from time to time by the company. It is further conceded that, for most of the period, credit memoranda were issued and delivered periodically by the company to the agent. There is also evidence to the effect that, when changes were made in the form of the credit memorandum, the agent complained to the company and was assured that so long as she got the credit the form of the memorandum made no difference.

The charge and credit practices of the company in its dealings with the agent were not uniform throughout the period covered by the suit. Up to January 26, 1933, the agent was charged one cent per gallon more than the posted wholesale price on all gasoline purchased in accordance with a pre-existing agreement, to be applied on the old indebtedness of the agent to the company. This extra charge of one cent per gallon was credited in February, 1933, and termed "refund to conform with collection of

1 cent additional on gas purchased month of January." In March, 1933, an additional one-half cent per gallon on January purchases was credited and termed "refund to conform with agreement." There is no evidence other than the form of credit memoranda issued for the period January 26, 1933, to February 26, 1935, of any agreement varying the terms of the written contract during that period. The agent paid or was charged the posted whole-sale price. The credit memoranda issued to the agent during this period are variously worded. The first credit allowed the agent during this period was issued March 17, 1933, and the credit amounted to one cent per gallon on the gasoline purchased during February. One-half cent of the credit was termed "refund to conform with agreement" and one-half cent thereof was termed "special verbal allowance for exclusive marketing privileges." The credit issued in April for purchases in March again amounted to one cent per gallon and was segregated into two equal parts, one termed "refund to conform with lease agreement" and one termed "refund to conform with verbal allowance." For each succeeding month, up to and including August, 1933, the credit amounted to one cent per gallon and was similarly segregated, one-half cent "to conform with lease agreement" or "to conform with agreement" and one-half cent per gallon termed "special verbal allowance for exclusive marketing privileges." The next two credits, *i.e.,* for September and October, issued in October and November, were segregated and one-half cent per gallon of the one cent allowed in October was termed "Lease rental, month of Sept., 1933" and one-half cent per gallon of the one-cent credit allowed in November was termed "Lease Rental - Month of Oct., 1933."

Thereafter, up to and including the month of May, 1937, monthly credits were issued by the company to the agent amounting to one cent per gallon on the gasoline

purchased and were each time termed "100% dealer earned commission" on gasoline purchased during the preceding month.

The period from January 26, 1933, to May 1, 1937, must however be divided into two periods, the first extending from January 26, 1933, to February 26, 1935, and the second from the last-mentioned date to May 1, 1937. This is necessary for the reason that the court found from the evidence that the rent was paid for the period ending February 26, 1935, and was not paid for the remainder of the period now under consideration.

There was evidence to the effect that during the period January 26, 1933, to and including February 25, 1935, gasoline sold to the agent was paid for or charged to him at the posted wholesale price and that throughout that period, without agreement or prearrangement, the company credited back to all its retail dealers one cent per gallon on all gasoline purchased. The local manager for the company, after testifying that from time to time instead of reducing posted prices of gasoline the company gave the general trade an additional cent in the form of a credit memorandum at the end of the month, explained why this was done, saying: "This was done for various reasons such as to meet competition or just to give the trade some additional commission." There was also evidence to the effect that on or shortly before February 26, 1935, the company, by verbal agreement, extended to the agent a limited line of credit with the understanding that all gasoline sold and delivered would be paid for or charged at one cent above the then wholesale price, the extra one cent to be applied on the charge account. The evidence shows that this special arrangement was adhered to until terminated May 1, 1937, and that thereafter the extra one cent per gallon was not paid or charged and

no credit allowed or payments made to the agent by the company.

After May 1, 1937, the agent paid or was charged the posted wholesale price and no payments or credits allowed.

The defendant makes the further contention that plaintiffs by their conduct are estopped to now claim that the rentals are not paid. The argument is, in effect, that when plaintiffs permitted the defendant to exercise its option to renew the lease at the expiration of the three-year term without demanding payment of rent, they became estopped to assert the claim now made. The crux of the argument is that, if the plaintiffs had attempted to collect one-half cent per gallon on gasoline purchased in addition to the credits allowed, the defendant would have promptly exercised its option reserved to it of terminating the agreement instead of renewing the agreement from time to time. We have been referred to no evidence to the effect that the defendant would have terminated or declined to renew the contract had it known that plaintiffs claimed that rent had not been paid. Apparently counsel would have us infer, from the mere fact that the parties disagree as to whether or not the company had paid rent in accordance with the contract, the defendant would have so acted.

"Under the rule that he has the burden of proof who has the affirmative of the issue, the burden of proof is on the party alleging and relying on an estoppel to establish all the facts necessary to constitute it, by a preponderance of the evidence, subject of course to the proper presumptions which may be indulged under the facts of the particular case." 21 C. J. § 267 C, p. 1250. (See also *Hata* v. *Dean Witter*, 32 Haw. 760, 765.) "In order to create an estoppel in pais the party pleading it must have been misled to his injury." 21 C. J. § 136 h, p. 1135.

"The conduct of a party, sought to be made the basis

of an estoppel in pais against him by silence, must be viewed in the light of the understanding he then had of his rights, and not in the light of such rights as they may be thereafter determined by the ultimate and conclusive adjudications of the courts." 21 C. J. § 154, p. 1152. The only evidence as to the understanding of either party was the evidence of Mrs. Gushiken to the effect that she thought the rent reserved in the lease was not payable until the end of the term. That being true, the silence of the plaintiffs at the time the lease was renewed could not work an estoppel.

Unless the defendant would have declined to renew the lease, had it known plaintiffs were claiming nonpayment of rent, we cannot see that it was misled to its injury. The defendant and plaintiffs had equal opportunities to know what their contract was. It does not appear that they ever discussed the meaning of the contract after it was entered into. It does appear, however, from protests made by the plaintiffs at the times when there was a change in the form of credit memoranda, that plaintiffs did not consider the credits passed to the plaintiffs as being correctly set forth in the memoranda and so informed the defendant's manager. This, we think, was sufficient to put the defendant on notice that there was a difference of opinion between them as to the construction of the contract. If the defendant was misled by the silence of the plaintiffs at the time the contract was extended, it was its own fault and not the fault of the plaintiffs.

Without attempting to further review the evidence, we conclude that there was substantial evidence, sufficient under the rule announced, to sustain the conclusion that the rent was paid for the period found by the court and likewise that there was sufficient evidence to sustain the

conclusion that the rent was not paid for the period found by the court.

The exceptions of both the plaintiffs and the defendant are found to be without merit and are therefore overruled.

*J. R. Cades* (*Carlsmith & Carlsmith* and *Smith, Wild, Beebe & Cades* on the briefs) for defendant.

*H. Irwin* (*Irwin & Harlocker* and *W. H. Smith* on the brief) for plaintiffs.