944 P.2d 97

**PANCAKES OF HAWAII, INC., a Hawai'i corporation, dba Maui Original Pancakes & Steak House, Plaintiff/Counterclaim Defendant–Appellant,**

v.

**POMARE PROPERTIES CORPORATION, a Hawai'i corporation, Defendant/Counterclaimant/Cross–Claim Defendant–Appellee,**

**James S. Romig, Defendant/Cross–Claim Defendant–Appellee,**

**Sofos Realty Corporation, a Hawai'i corporation, and Lee Carter, Defendants/Cross–Claim Plaintiffs–Appellees.**

**No. 19395.**

Intermediate Court of Appeals of Hawai'i.

Aug. 1, 1997.

301

R. Patrick Jaress (Jaress & Leong, of counsel), on the briefs, Honolulu, for plaintiff/counterclaim defendant-appellant.

William S. Miller, Margaret Jenkins Leong and Richard H.S. Sing (Goodsill Anderson Quinn & Stifel, of counsel), on the brief, Honolulu, for defendants/cross-claim plain-

tiffs-appellees Sofos Realty Corporation and Lee Carter.

Before BURNS, C.J., and KIRIMITSU, J., and Circuit Judge MARKS in Place of WATANABE, J., Recused.

KIRIMITSU, Judge.

In this fraud and misrepresentation case, Plaintiff/Counterclaim Defendant–Appellant Pancakes of Hawaii, Inc., a Hawai'i corporation, doing business as Maui Original Pancakes & Steak House (Pancakes), appeals from the Second Circuit Court's October 31, 1995 judgment granting the motion for summary judgment filed by Defendants/Cross–Claim Plaintiffs–Appellees Sofos Realty Corporation, a Hawai'i corporation (Sofos), and Lee Carter (Carter) and striking of Pancakes' demand for a jury trial. We agree with Pancakes that (1) neither Sofos nor Carter were parties to the lease agreement between Pancakes and Pomare Properties Corporation (Pomare Properties) and thus were estopped from relying on the jury waiver clause in the agreement, and (2) genuine issues of material fact remain on the veracity of statements made about both the actual occupancy rates and the amount of interest in the shopping center, as well as the information that should have been disclosed to Pancakes about the failure of the leasing program. Thus, we vacate that part of the October 31, 1995 judgment dealing with the issues addressed in this opinion and remand for a trial by jury.[1]

## I. BACKGROUND

This controversy revolves around the Lahaina Shopping Center in Lahaina, Maui. The center was designed and developed by the 3900 Corporation, which leased the center to James Romig (Romig). Romig subsequently hired Pomare Properties as the managing agent of the center. Pomare Properties in turn hired Sofos to handle managing and leasing duties. (Carter was a real estate salesman working for Sofos.) Sofos and Carter, however, did not make any final decisions regarding the leases or their terms and did not sign the agreements as either landlords or agents. Pomare Properties made all final decisions and signed the shopping center leases.

In the spring of 1990, Sofos and Carter began actively recruiting potential tenants for the shopping center as a part of the leasing program. One of their targets was Pancakes, which at the time owned and operated two profitable restaurants in Honolulu. Carter contacted Young Acopan (Acopan), the president of Pancakes, and began discussions about Pancakes opening a third restaurant in the shopping center. According to Pancakes, Carter made glowing representations about the success of the leasing program and the potential for Pancakes to thrive in the new center. He allegedly told Pancakes that he was either in the process of signing up enough tenants that would soon make the center reach an eighty to eight-five percent occupancy level, or that he expected the center to have an eighty to eighty-five percent occupancy level at some point in the future.

After three months of negotiations and after having its attorney review the proposed lease agreement, Pancakes entered into a lease agreement with Pomare Properties on June 27, 1990. Pancakes subsequently built a restaurant in the shopping center and opened its doors in September 1991. Unfortunately, the inability of the center to lease more than thirty-five percent of its space and the lack of foot traffic through the mall resulted in huge financial losses for Pancakes. Unable to sustain the losses, Pancakes closed its doors on December 7, 1991.

On December 31, 1991, Pancakes sued Romig, Pomare Properties, Sofos, and Carter for, among other things, fraud, misrepresentation, and breach of the duty of good faith and fair dealing. The complaint was amended on February 28, 1994. In its initial complaint, Pancakes requested a jury trial. On January 27, 1994, Pomare Properties moved

---

1. The October 31, 1995 judgment includes elements that are the subject of a related appeal by Defendant–Counterclaimant/Cross–Claim Defendant–Appellee Pomare Properties, Inc. (Pomare Properties) that is currently pending before this court (No. 19370). Our holding in this appeal does not affect appeal No. 19370.

to strike Pancakes' demand for a jury trial based on an express waiver in the lease agreement.[2] Sofos joined the motion on February 9, 1994. On March 16, 1994, the Second Circuit Court granted the motion.

After settling with Romig and Pomare Properties on some claims and having others dismissed by summary judgment, Pancakes proceeded with its fraud and misrepresentation claims against Sofos and Carter. On February 6, 1995, Sofos filed a motion for summary judgment on Pancakes' first amended complaint. In the motion and subsequent hearing, Sofos argued that all of the representations allegedly made by Carter about occupancy rates and the leasing program were predictions or opinions about future events. Sofos additionally argued that any statements made by Carter were barred by an integration clause in the lease agreement between Pancakes and Pomare Properties.[3] The trial court agreed and granted the motion on May 22, 1995. On October 31, 1995, the trial court entered its judgment. On November 13, 1995, Pancakes filed a timely notice of appeal.

## II. *DISCUSSION*

On appeal, Pancakes challenges the trial court's order striking the demand for jury trial and the order granting summary judgment on the fraud and misrepresentation claims. On the jury trial issue, Pancakes contends that Sofos and Carter were strangers to the lease agreement between Pancakes and Pomare Properties, do not have enforceable rights under the agreement, and thus cannot use section 29.04 of the lease agreement to shield themselves from a jury trial.

Pancakes attacks the summary judgment order by contending that: (1) an integration clause never bars parol evidence of fraud; and (2) the amended complaint alleged genuine issues of material fact relating to fraud and failure to disclose. We address each argument in turn.

### A. *Waiver Of Jury Trial*

Before addressing the merits of Pancakes' argument on the alleged waiver of trial by jury, we first discuss the standard of review and the relevant legal principles concerning the right to and waiver of a trial by jury.

#### 1. *Standard of review.*

■ This issue involves the interpretation of a lease provision. "While a lease is both a conveyance and a contract, its essence is contractual; accordingly, we review the lease under principles of contract law." *Cho Mark Oriental Food, Ltd. v. K & K Int'l*, 73 Haw. 509, 519, 836 P.2d 1057, 1063 (1992) (citing *Maui Land & Pineapple Co. v. Dillingham Corp.*, 67 Haw. 4, 10, 674 P.2d 390, 394 (1984)). Generally, "the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court." *Id.* (citing *Stewart v. Brennan*, 7 Haw.App. 136, 142, 748 P.2d 816, 821 (1988) (citing *Hanagami v. China Airlines, Ltd.*, 67 Haw. 357, 364, 688 P.2d 1139, 1144 (1984))). Additionally, given the involvement of both a lease and an agent in this case, both contract and agency law must be applied.

■ Our goal when interpreting a contractual provision is to determine the inten-

---

2. Section 29.04 of the lease agreement between Plaintiff/Counterclaim Defendant–Appellant Pancakes of Hawaii, Inc., a Hawai'i corporation, doing business as Maui Original Pancakes & Steak House (Pancakes), and Pomare Properties Corporation contains an express waiver of trial by jury:

> The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or claim of injury or damage....

3. Section 29.12 of the lease agreement explains that the agreement is a full and final statement of the terms agreed upon:

> It is understood that there are no oral or written agreements or representations between the parties hereto affecting this Lease Agreement, and this Lease supersedes and cancels any and all previous negotiations, arrangements, representations, brochures, agreements, applications and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter hereof, and none thereof shall be used to interpret or construe this Lease.

tion of the parties. "The intention of the parties is to be gathered from the whole instrument, and if this cannot be discovered, but there exists an ambiguity, then such construction must prevail as is most strong against the covenanter [sic], for he [or she] might have expressed himself [or herself] more clearly." *Coney v. Dowsett,* 3 Haw. 685, 686 (1876) (internal quotation marks and citations omitted); *see Gushiken v. Shell Oil Co.,* 35 Haw. 402, 416 (1940) ("Since one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he [or she] is dealing, doubts arising from ambiguity of language are resolved in favor of the latter.") (internal quotation marks and citation omitted); *see also Brazelton v. Jackson Drug Co., Inc.,* 796 P.2d 808, 810 (Wyo.1990) (any doubts concerning meaning of lease are resolved against party drafting it). Furthermore, the " 'terms of a contract should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning.' " *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 108–09, 839 P.2d 10, 24 (1992) (quoting *SGM Partners v. The Profit Co.,* 8 Haw.App. 86, 123, 793 P.2d 1189, 1212 (citing *Maui Land & Pineapple Co.,* 67 Haw. at 10, 674 P.2d at 394, *rev'd in part on other grounds,* 71 Haw. 506, 795 P.2d 853 (1990))).

## 2. *Legal principles of right to jury trial in civil cases.*

The right to a jury trial in civil cases is ingrained in our state constitution. Article I, section thirteen explains that "[i]n suits at common law where the value in controversy shall exceed five thousand dollars, the right of trial by jury shall be preserved...." HAW. CONST. art. I, § 13.[4] Article I, section thirteen has been buttressed by the legislature, which reinforced the provision by statute: "When the right of trial by jury is given by the Constitution or a statute of the United States or this State and the right has

not been waived, the case shall be tried with a jury." Hawai'i Revised Statutes § 635–13 (1993). Completing the trilogy, the Hawai'i Supreme Court acknowledged this right in the Hawai'i Rules of Civil Procedure (HRCP): "The right of trial by jury as given by the Constitution or a statute of the State or the United States shall be preserved to the parties inviolate." HRCP Rule 38(a). Given the recognition by two branches of the Hawai'i state government, as well as both the Hawai'i and United States Constitutions, the right to a jury trial in civil cases is clearly among the most sacred, fundamental rights enjoyed by our citizens.

Despite the hallowed treatment afforded this right, it can, like many others, be waived. In 1955, the Hawai'i Supreme Court discussed some of the aspects of waiver:

We recognize that "the constitutional right to a jury trial in civil cases is a mere privilege, and as such is capable of being waived." *United States v. National City Bank,* 281 F. 754, 757 (2d Cir.1922). "It is well-settled that such right may be waived in civil cases, and that it may be waived by actions or conduct as well as expressly...." *Ah Hing v. Ah On,* 15 Haw. 59, 60 (1903); *First Trust Co. of Hilo, Ltd. v. Cabrinha,* 24 Haw. 777 (1919). "It seems, therefore, that both by express agreement in open court, and by implied consent, the right to a jury trial could be waived." *Kearney v. Case,* [12 Wall. 275] 79 U.S. 275, 282 [20 L.Ed. 395] (1870). And this principle applies whether the failure to claim such right is intentional or inadvertent. *Gulbenkian v. Gulbenkian,* 147 F.2d 173 (2d Cir.1945).

*Seong v. Trans–Pacific Airlines, Ltd.,* 41 Haw. 231, 240 (1955). Although the court described the right as a "mere privilege" and loosely discussed waiver in sweeping terms, it later qualified the preceding quote by explaining:

It is well-established that trial by jury being a constitutional and fundamental

---

**4.** This state constitutional provision tracks the language of the federal constitutional provision:

In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no

fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law. U.S. CONST. amend. VII.

right, "courts indulge every reasonable presumption against the waiver of such right" *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 [57 S.Ct. 809, 811, 81 L.Ed. 1177] (1937); *Kearney*, 79 U.S. at 275; "and in order to create a waiver by implication unequivocal acts are necessary to be shown." *Jones v. Murrow [Morrow]*, 21 Ala.App. 326, 108 So. 81, 82 (1926). It has also been held that "[a] waiver of a jury trial will not be implied in doubtful cases." *Neal v. Drainage Dist. No. 2*, 42 Idaho 624, 248 P. 22, 24 (1926).

*Id.* at 242.

The supreme court reiterated the substance of the *Seong* holding in 1972: "We consider the right to a jury trial to be inviolate in the absence of an unequivocal and clear showing of a waiver of such right either by express or implied conduct. This court will indulge every reasonable presumption against the waiver of such right." *Lii v. Sida of Hawaii, Inc.*, 53 Haw. 353, 355–56, 493 P.2d 1032, 1034 (1972) (citing *Seong*, 41 Haw. at 243).

■ Hence, although the right to a jury trial in civil cases is sacred and fundamental, it can be waived either expressly or impliedly. Furthermore, unequivocal acts pointing explicitly to a waiver must be shown. Additionally, on appeal we employ every reasonable presumption against every claim of waiver. And when in doubt, we will not imply a waiver of the right to a jury trial.

### 3. *The jury trial waiver lease provision did not apply to Sofos or Carter.*

Pancakes contends that when contracting parties agree to waive their rights to a jury trial with each other, a stranger to the contract cannot use that waiver to shield himself or herself from a jury trial. We agree.

On February 9, 1994, Pomare Properties argued before the Second Circuit Court on its motion to strike Pancakes' demand for a jury trial. Sofos joined Pomare Properties' argument and made an argument of its own. Excerpts from the hearing capture the essence of both the arguments and counterarguments:

[POMARE]: I believe the next motion is mine, your Honor. I'd move to strike the jury demand in the Pancakes case. The motion is basically identical to the one that we filed in the Shanghai or Dragonfly case, and it's based upon the same provision of the lease.

I believe the Court granted the motion to strike the jury trial and entered the order on it in late January of this year, and we'd just seek the same type of ruling in the Pancakes case because it's an identical lease provision and there's no difference.

[PANCAKES]: We oppose that, your Honor, if I may.

We have several different defendants here. [Pomare Properties is] the landlord[ ]. The basis of the motion that's brought before the Court to strike our demand for jury trial is the lease between Pancakes of Hawaii and the landlords.

... [In the lease] it says the parties shall and they hereby do waive trial by jury in any action proceeding [sic] brought by either of the parties. Okay.

The other parties, Sofos Realty and Carter were parties to this case [sic] are not parties to the lease. They don't come within that waiver of rights.

Now, I understand that the Court has already ruled with respect to the landlords in the Dragonfly case that this provision was a waiver of jury trial by Pancakes of Hawaii. We filed our memorandum so we preserved our position for the record, but I understand the Court may feel that the same should be held with regard to the landlords in this case.

I would argue that does not apply to the other parties who are not landlords. There's no privity of contract between Pancakes of Hawaii and Sofos Realty or its agent Mr. Carter. There's no basis to say that by signing the lease Pancakes of Hawaii waived its right to jury trial with regard to those third parties.

. . . .

Also if there's any doubt, the cases cited in our brief indicate that the Ha-

waii [Hawaiʻi] Appellate rules said if there's a doubt as to whether the party should get a jury trial, the Court should give us a jury trial.

The essence is they're not parties to the lease. We didn't bargain for the waiver of jury trial with Sofos Realty or Mr. Carter and they're not entitled to strike the demand for jury trial with respect to the claims against those two parties. Thank you.

[POMARE]: ... I believe the same argument was made in the Dragonfly [sic] with respect to the officer who was a party to that case. Being an agent of Pomare in that case the waiver of jury trial did apply to her and the same thing should happen to Sofos because the allegation is that they were our agents. So if the jury is stricken with regard to the landlord, the same allegations, because they arise under this lease, should also apply.

[SOFOS]: We agree with [Pomare Properties'] representations and arguments. Sofos Realty was hired by Pomare to lease space at the Lahaina Center and that's the whole reason why we're in the lawsuit. Since we're acting as their agent, we step into their shoes for purposes of waiver of the trial. Since you ruled that Pomare, who is an agent, can take advantage of that waiver, so too in this lawsuit can Sofos Realty who are the agents of Pomare Properties.

And the second point is, if you deny the motion there's going to be additional jury confusion that is going to result. You have a situation where the jury is going to have to distinguish between the Pancakes' allegations and the Shanghai's allegations. If you deny the motion you're going to have the additional burden of distinguishing between the [sic] Pomare Properties and claims against Sofos. We believe that would lead to undue jury confusion and would be impractical. For those reasons we ask that the Court grant the motion.

[PANCAKES]: I take exception to the statement that the jury is somehow going to be confused. If they're told that their deliberations are with respect to only two parties, I'm sure they can keep it straight in their head.

The provision that they're using quite clearly says it was a matter bargained for between the landlord and the tenant with respect to the claims between them. If there's any doubt about that, the Hawaii [Hawaiʻi] Appellate courts can say that it's been resolved in favor of the person requesting the jury trial.

It's also undisputed that the landlord drafted the lease. So if there's any ambiguity the usual rules of interpretation are finding a strict construction against the landlord and resolution of any ambiguity against the landlord.

So it's our belief that it doesn't allow for protection from the jury trial to people who are not parties to the lease. The people in the other case where the jury trial was stricken are all principles [sic] of the landlord.

THE COURT: I think the adequately briefed and argued, [sic] unless you come up with some other new cases the Court is going to grant the defendant's [sic] motion.

We believe the trial court made a mistake. Pancakes correctly framed the issue as whether a stranger to an agreement has enforceable rights under the agreement. A number of factors bode heavily against affording enforceable contract rights to an agent who is neither a party to an agreement nor an intended third-party beneficiary.

We first look to the intention of the parties in this case. Romig hired Pomare Properties as the managing agent of the Lahaina Shopping Center. Pomare Properties itself hired Sofos to handle managing and leasing duties. Sofos then used Carter as its point man to solicit tenants for the leasing program. When Carter successfully lured a potential tenant, a lease agreement was signed between the tenant, Romig, and Pomare Properties as Romig's agent. Indeed, that is precisely how the lease agreement with Pancakes was crafted. The cover page of the lease reads: "Lease between Pomare Properties Corp. and Pancakes of Hawaii, Inc. dba Original Pancake House [-] Tenant[.]"

The first paragraph of the lease itself then explicitly delineates who the parties to the agreement are:

> THIS LEASE made and entered into this 27th day of June, 1990, by and between JAMES S. ROMIG, POMARE PROPERTIES CORPORATION, his managing agent, a Hawaii [Hawaiʻi] corporation, hereinafter called "Landlord," and Pancakes of Hawaii, Inc., dba Original Pancake House, whose principal place of business and post office address is 1414 Dillingham, Honolulu, Hawaii [Hawaiʻi] 96817, hereinafter called "Tenant;" . . . .

In addition, the agreement is signed by Pomare Properties as landlord and Pancakes as tenant.

Thus, under the terms of the lease, the parties included the landlord Romig, the managing agent Pomare Properties (also referred to as the landlord), and the tenant Pancakes. Neither Sofos nor Carter appear anywhere within the four corners of the agreement.[5]

The lease also contains an express waiver of a jury trial by the parties to the lease. The waiver applies to the "parties hereto." *See supra* note 2. A "party" is "[a] person concerned or having or taking part in any affair, matter, transaction, or proceeding, considered individually." *Black's Law Dictionary* 1122 (6th ed.1990). It also includes "a signatory to a legal instrument." *Webster's Encyclopedic Unabridged Dictionary of the English Language* 1053 (1989). "Hereto" is defined as "to this matter, document, subject, etc.; regarding this point . . . ." *Id.* at 664. Hence, Romig, Pomare Properties, and Pancakes were all "parties hereto" because they took part in the lease transaction and were either expressly mentioned or signatories to the legal instrument signed by the tenant and the landlord.

■ Because there is no mention of either specific or unnamed agents other than Po-

mare Properties, we hold that Sofos and Carter were not parties to the lease agreement between Romig, Pomare Properties, and Pancakes. As a result, although both Pancakes and Pomare Properties intended to and did expressly waive their right to a jury trial in section 29.04 of the lease agreement, there was no intent to waive that right with third parties. Moreover, we disregard any inference that the "parties hereto" includes unnamed third parties, including unnamed agents, because our construction of section 29.04 must, where possible, favor Pancakes. *Gushiken*, 35 Haw. at 416; *Coney*, 3 Haw. at 686.

There is further support from both the Hawaiʻi Supreme Court and the *Restatement (Second) of Agency* for the conclusion that Sofos and Carter were not parties to the agreement between Pancakes and Pomare Properties. The well-settled rule embraced by the supreme court in 1974 explains that " '[u]nless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract.' " *Corps Constr., Ltd. v. Hasegawa*, 55 Haw. 474, 476, 522 P.2d 694, 695 (1974) (quoting *Restatement (Second) of Agency* § 320 (1958)). The comments to section 320 of the Restatement expand on the aspects of a "disclosed principal":

> Whether or not a person purporting to act as agent for another person becomes a party to the contract depends upon the agreement between such person and the other party . . . . [A] principal is disclosed if, at the time of making the contract in question, the other party to it has notice that the agent is acting for a principal and of the principal's identity. One who purports to contract on behalf of a designated person does not manifest by this that he [or she] is making a contract on his [or her] own account, and only where he [or she] so manifests does the agent become a party to a contract [that] he [or she] makes

---

5. During the April 27, 1995 hearing on Plaintiffs–Appellees Sofos Realty Corporation's, a Hawaiʻi corporation (Sofos), and Lee Carter's (Carter) motion for summary judgment, their counsel conceded that there was no contract between Carter and Pancakes:

> [SOFOS]: . . . [T]here's got to be a contract before there's a breach of a contractual provision. There's no contract between Lee Carter and Mrs. Acopan.

for the principal. In absence of other facts, the inference is that the parties have agreed that the principal is, and the agent is not, a party. This is true although the agent uses such an expression as, "I will sell." ...

*Restatement (Second) of Agency* § 320 cmt. a, at 67 (1958).

■ Here, there is no question that the identity of both Romig and Pomare Properties were fully disclosed at the time the lease agreement was signed. This fact is not disputed by either side. Moreover, there is nothing in the record indicating that either Sofos or Carter attempted to make the agreement on their own account. According to the supreme court and the Restatement, then, neither are considered parties to the lease agreement.

■ Still another factor that cuts against a waiver in favor of Sofos and Carter is the general rule that third parties do not have enforceable contract rights. The exception to the general rule involves intended third-party beneficiaries.

A third party beneficiary is " '[o]ne for whose benefit a promise is made in a contract but who is not a party to the contract.' " *Black's Law Dictionary* 1480 (6th ed.1990) (quoting *Chitlik v. Allstate Ins. Co.*, 34 Ohio App.2d 193, 299 N.E.2d 295, 297 (1973)). "[T]he rights of the third [party beneficiary] ... must be limited to the terms of the promise[;]" and this promise "may be express or it may be implied from the circumstances[.]" *Remington Typewriter Co., Inc. v. Kellogg*, 19 Haw. 636, 640 (1909) (internal quotation marks and citation omitted).

Furthermore, "[a] prime requisite to the status of 'third party beneficiary' under a contract is that the parties to the contract must have intended to benefit the third party, who must be something more than a mere incidental beneficiary." *Black's Law Dictionary* at 1480 (quoting *McKinney v. Davis*, 84 N.M. 352, 353, 503 P.2d 332, 333 (1972)). For example, if contracting parties intend to confer direct benefits on a third party, that third party will have generally an enforceable contractual right. *See Villa Sierra Condominium Ass'n v.*

*Field Corp.*, 878 P.2d 161, 166 (Colo.App. 1994) (recognizing the rights of third parties who were not signatories to a construction contract); *Seubert Excavators, Inc. v. Eucon Corp.*, 125 Idaho 409, 417, 871 P.2d 826, 834 (1994) (concluding that non-parties to a contract bond were intended third party beneficiaries).

*Hunt v. First Ins. Co. of Hawaii*, 82 Hawai'i 363, 367, 922 P.2d 976, 980 (App.) (brackets in original), *cert. dismissed*, 83 Hawai'i 204, 925 P.2d 374 (1996); *see Restatement (Second) of Contracts* § 304, at 448 (1979) ("A promise in a contract creates a duty in the promisor to any *intended beneficiary* to perform the promise, and the *intended beneficiary* may enforce the duty."). (Emphasis added.)

■ In our case, none of the parties contend that Sofos and Carter were intended beneficiaries. In fact, nothing in the terms of the lease or in the record indicates Sofos or Carter would benefit in any way from the lease agreement. Thus, Sofos and Carter do not have any enforceable contract rights as third-party beneficiaries in the agreement between Pancakes and Pomare Properties. Because they have no enforceable rights under the agreement, they are barred from attempting to extend the jury waiver provision beyond Romig and Pomare Properties.

Based on the preceding conclusions, there was clearly no unequivocal act indicating that a jury trial was waived for Sofos, Carter, or any other third party. In light of our duty to indulge every reasonable presumption against the waiver of a jury trial, as well as the hedge placed around the constitutional right to a jury trial in civil cases by both our state and federal governments, we hold that there was no intent on the part of Romig, Pomare Properties, and Pancakes to waive a jury trial in favor of either Sofos or Carter. Accordingly, the Second Circuit Court committed error when it struck Pancakes' demand for a jury trial in the case against Sofos and Carter.

### B. *Summary Judgment*

Sofos and Carter grounded their motion for summary judgment on two arguments:

"First, all [of Pancakes' fraud] claims are precluded by the integration clause in the Lease. Second, all such claims are subject to dismissal because they are not based on statements of past or present fact." Pancakes argued below and argues now on appeal that: (1) an integration clause does not bar parol evidence of fraud; (2) the representations allegedly made by Sofos and Carter all related to past or existing facts; and (3) Sofos and Carter failed to disclose all material information about the leasing program.

We address each of Pancakes' arguments after discussing the standard of review.

### 1. *Standard of review.*

 On appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.

*Higa v. Lino,* 82 Hawai'i 535, 537, 923 P.2d 952, 954 (App.) (quoting *Iddings v. Mee–Lee,* 82 Hawai'i 1, 5, 919 P.2d 263, 267 (1996) (citation omitted) (internal citation marks omitted)), *cert. denied,* 83 Hawai'i 204, 925 P.2d 374 (1996). In addition, "[t]he evidence is viewed in the light most favorable to the non-moving party." *State for Use & Benefit of Ameron, Inc. v. Tradewinds Elec. Serv. & Contracting Inc.,* 80 Hawai'i 218, 222, 908 P.2d 1204, 1208 (1995) (citing *Board of Directors of Ass'n of Apartment Owners v.*

*United Pacific Ins. Co.,* 77 Hawai'i 358, 360, 884 P.2d 1134, 1136 (1994)).

### 2. *The parol evidence rule does not bar evidence of fraud.*

Pancakes contends that "an integration clause in a lease [does not] prevent a fraud action against the procuring broker and salesman." We agree.

The parol evidence rule generally precludes the use of extrinsic evidence to vary or contradict the terms of an unambiguous and integrated contract—a writing the parties have adopted as the expression of their final agreement.[6] The rule applies to exclude both oral and written extrinsic evidence. It also operates to exclude evidence that varies or contradicts both the express and the implied terms of a written agreement.

The parol evidence rule applies when there is a single final memorial of the understanding of the parties; when that takes place, all prior and contemporaneous negotiations are excluded and are superseded by such written memorial.[7]

The parol evidence rule is subject to many limitations and exceptions [that] permit the reception of parol evidence where, for example, the writing in question is ambiguous or incomplete, or is attended by fraud, mistake, or erroneous omission. In addition, since application of the rule presupposes the existence of a valid contract, parol evidence is admissible for the purpose of challenging the existence or validity of the contract.

29A Am.Jur.2d *Evidence* § 1092, at 551–52 (2d ed.1994) (footnotes omitted).

The Utah Supreme Court provides a cogent description of the relationship between the parol evidence rule and fraud:

[The parol evidence rule] ... contains an exception for fraud. Parol evidence is admissible to show the circumstances under which the contract was made or the

---

6. Stated differently, "[a]n agreement is integrated where the parties thereto adopt the writing or writings as the final and complete expression of the agreement and an 'integration' is the writing or writings so adopted." *Black's Law Dictionary* 809 (6th ed.1990) (citation omitted).

7. The Hawai'i Supreme Court made a similar statement in 1968: "Once the parties execute an

instrument [that] contains their whole agreement, their previous negotiations and agreements are legally ineffective and evidence relating to those previous negotiations or agreements is irrelevant regardless of who offers it." *Akamine & Sons, Ltd. v. American Sec. Bank,* 50 Haw. 304, 310, 440 P.2d 262, 266 (1968).

purpose for which the writing was executed. This is so even after the writing is determined to be an integrated contract. Admitting parol evidence in such circumstances avoids the judicial enforcement of a writing that appears to be a binding integration but in fact is not.

*Union Bank v. Swenson,* 707 P.2d 663, 665 (Utah 1985).[8]

The *Restatement (Second) of Contracts* adds:

> What appears to be a complete and binding integrated agreement may be a forgery, a joke, a sham, or an agreement without consideration, or it may be voidable for fraud, duress, mistake, or the like, or it may be illegal. Such invalidating causes need not and commonly do not appear on the face of the writing.

*Restatement (Second) of Contracts* § 214 cmt. c, at 134 (1981). Section 209(3) further explains that "where the parties reduce an agreement to a writing [that] in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression." *Id.* § 209(3).

■ The lease agreement in our case contains a garden variety integration clause. *See supra* note 3. And as the foregoing discussion illustrates, parol evidence is generally not admissible to vary or contradict the terms of a fully integrated agreement. *See supra* note 7. It is also clear, however, that there is a well-recognized exception for fraud. *See supra* note 8. But the trial court failed to acknowledge this aspect of the parol evidence rule. This is evident from our review of the following excerpt from the April 27, 1995 hearing on Sofos' and Carter's motion for summary judgment:

THE COURT: Okay. Then its going to be the ruling of the court that these motions for summary judgment—I'm going to find that based on the facts in this case that as to the specific issues involved, that there does not appear to be a dispute as to material facts.

There's argument that there are disputes, but there's no—as far as I can see, actual disputes as to material facts. So I'm going to find that—I'm going to grant the motions starting with the fraud it kind of tumbles on down, and so I'm going to grant the motions in their entirety.

Finding that basically—well, not finding, but *I'm going to agree with the argument that the integration clause does take precedence here.* And that even if it didn't, that the facts are such that the type of situation we have here is a promise for the future, and that therefore, that fraud under our laws would not apply.

(Emphasis added.)

■ In our opinion, the trial court failed to properly apply the law governing the parol evidence rule, and more specifically, integration clauses. Section 29.12 of the agreement (the integration clause) was not the end-all—contrary to the argument of Sofos and Carter—for prior or contemporaneous agreements or representations that potentially involved fraud. The record does not indicate that the trial court acknowledged or applied this distinction. Accordingly, we hold that because Pancakes made allegations of fraud, summary judgment should not have been granted, in whole or in part, based on section 29.12 of the agreement; and, consequently, Sofos and Carter were not entitled to a judgment as a matter of law.[9]

---

**8.** We made similar proclamations in 1981, 1988, and 1989. *Touche Ross Ltd. v. Filipek,* 7 Haw. App. 473, 482, 778 P.2d 721, 727 (1989) ("The general rule is that the parol evidence rule is inapplicable where the issue is whether the contract was procured by fraud.") (internal quotation marks and citations omitted); *Honolulu Fed. Sav. & Loan Ass'n v. Murphy,* 7 Haw.App. 196, 200, 753 P.2d 807, 811 (1988) (parol evidence rule not applicable "where it appears that a written agreement has been conceived in fraud")

(internal quotation marks and citation omitted); *Cosmopolitan Fin. Corp. v. Runnels,* 2 Haw.App. 33, 40, 625 P.2d 390, 396 (1981) (parol evidence rule not applicable where it appears agreement was "conceived in fraud").

**9.** Sofos' and Carter's reliance on the parol evidence rule raises an issue similar to the jury trial issue, namely, whether a stranger to an agreement can invoke the parol evidence rule. We believe our discussion in *In re O.W. Limited Part-*

**3. There are genuine issues of material fact involving Pancakes' fraud claim.**

Pancakes next argues that Carter's representations about the occupancy rates of the shopping center related to past or present facts sufficient to raise a genuine issue of material fact on its fraud claim. We agree.

Pancakes was allegedly fraudulently induced by Sofos and Carter into signing the lease agreement with Romig and Pomare Properties.

To constitute fraudulent inducement sufficient to invalidate the terms of a contract, there must be (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to [his or her] damage.

The false representation, to be actionable, must relate to a past or existing material fact, and not to the happening of future events[.] Generally, fraud cannot be predicated upon statements [that] are promissory in their nature at the time they are made and [that] relate to future actions or conduct. A promise relating to future action or conduct will be actionable, however, if the promise was made without the present intent to fulfill the promise[.]

*Honolulu Fed. Sav. & Loan Ass'n v. Murphy*, 7 Haw.App. 196, 201–02, 753 P.2d 807, 811–12 (1988) (first, third, and fourth brackets added) (internal quotation marks and citations omitted); *accord Hawaii's Thousand Friends v. Anderson*, 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989) (listing the elements of fraud in the inducement); *Stahl v. Balsara*, 60 Haw. 144, 149, 587 P.2d 1210, 1214 (1978) (discussing past or present fact requirement).

The only element of fraud that is in dispute is the "past or existing material fact" aspect. Sofos and Carter argue that all of the alleged statements were nothing more than opinions or predictions about future events. We disagree.

There are two statements that Pancakes contends were fraudulent. The first comes from a brochure received by Pancakes from Sofos that states, among other things, that "[a]vailable space is going fast." We can quickly conclude that the preceding statement was false by pointing to the deposition testimony of a Sofos representative:

[PANCAKES:] . . . Read what it says about spaces going fast.

[SOFOS:] It says, "Substantial amenities will be included for the prospective tenant." I can't read the top line, but it says under that, "Center is an opportunity that should not be overlooked. Available space is going fast. Reserve yours today."

[PANCAKES:] Well, is it true as of the date of that fact sheet, that the available spaces were going fast?

. . . .

*nership*, 4 Haw.App. 487, 668 P.2d 56 (1983), which explained two Hawaiʻi Supreme Court cases, sheds light on the issue:

> In *Chang v. Meagher*, 40 Haw. 96, 106 (1953), our supreme court stated that the parol evidence rule is "neither binding nor available" to strangers to the instrument and "may not properly be invoked by them nor against them." However, *Chang* was later limited to mean only that a stranger to the instrument has the right to show that the instrument is fraudulent as to him [or her]. *Akamine & Sons*, 50 Haw. at 304, 440 P.2d at 262. In *Akamine & Sons*, our supreme court held that the parol evidence rule must be applied in any action where the issue involved is what rights or duties were created by the instrument even if a party to the action was a stranger to the document.

*Id.* at 490, 668 P.2d at 60 (citations omitted).

Thus, according to the supreme court, the parol evidence rule applies to any scenario where rights and duties created by the instrument are at issue, regardless of whether those involved are parties or strangers to the agreement.

We have little trouble distinguishing this issue from the jury trial issue. First, the parol evidence rule does not allow a stranger to enforce specific terms of an agreement; nor does it allow strangers to step into the shoes of contracting parties. Second, allowing strangers to rely on the parol evidence rule does not implicate the grave constitutional questions that permeate the jury trial issue. So while it would be a mistake to create a blanket rule allowing strangers to invoke terms of a contract, particularly where fundamental rights are involved, the parol evidence rule simply does not raise identical concerns.

[SOFOS:] I would say you're correct, *that is not true* . . . .

(Emphasis added.)

 We also conclude that the statement "[a]vailable space is going fast" plainly related to an existing fact, specifically, that available space at the shopping center was currently being leased so quickly that few spaces would soon be left.[10] Not only was this statement false, as conceded by Sofos, but it was materially false as well. Jim Fleming (Fleming), the leasing agent for Romig, testified at his deposition that the amount of lease space and the rate at which space is being leased is of utmost importance to potential tenants:

> [FLEMING:] . . . You understand that in our industry that is one of the first questions that is asked by any prospect is how much is leased and how much is gone and what spaces are available.

There are two primary reasons why prospects are concerned about the availability of lease space: bargaining power before a lease is signed and financial viability after the business opens its doors. Diana "Dee" Spector (Spector), a representative of Pomare Properties, agreed during her deposition testimony that there is a concrete relationship between lease space and bargaining power:

> [SPECTOR:] . . . A shopping center that is not fully occupied can provide greater concessions than one that can command a full rent for one space.
>
> . . . .
>
> [PANCAKES:] What would be a concession, for example?
>
> [SPECTOR:] Any number of things.
>
> [PANCAKES:] Well, just for an example.
>
> [SPECTOR:] A free parking stall.
>
> . . . .
>
> [PANCAKES:] The tenant, potential tenant, negotiating with a landlord of a shopping center is in a much better,

stronger bargaining position when the landlord has a very lightly-leased-out shopping center as opposed to a very heavily-leased-out shopping center. Isn't that correct?

> [SPECTOR:] In my opinion, they would have a better bargaining position.

Spector also discussed the correlation between lease space and survival:

> [PANCAKES:] What did you understand that relationship to be?
>
> [SPECTOR:] Which relationship?
>
> [PANCAKES:] Between the foot traffic and the tenants.
>
> [SPECTOR:] That the foot traffic would increase as we got more tenants.
>
> [PANCAKES:] So if I understand the relationships correctly, the more tenants the Center had, the more foot traffic there would be, and the more foot traffic there would be, the higher the gross revenues of the retail shops would be?
>
> [SPECTOR:] In theory.
>
> [PANCAKES:] You didn't disagree with that theory, did you?
>
> [SPECTOR:] No, I did not.

The second allegedly fraudulent statement relied on by Pancakes is Carter's representation about the amount of space that was either in the process of being leased or would actually be leased in the near future. In a deposition taken by Pomare Properties, Acopan testified about Carter's statements during the lease negotiations:

> [POMARE:] I am trying to ask you your best recollection of exactly what [Carter] told you. And what I mean by that is the words he used.
>
> [ACOPAN:] Yes. He already told me—I mean not he already told me. He is the one that told me the tenant is going to

---

**10.** We are not persuaded by Sofos' and Carter's contention that the statement is "classic sales puffery." Puffing is "an expression of opinion by [a] seller not made as a representation of fact." *Black's Law Dictionary* 1233 (6th ed.1990) (citation omitted). The *Restatement (Second) of Torts* describes it as "loose general statements made by sellers in commending their wares. . . ." *Restatement (Second) of Torts* § 542 cmt. e, at 91 (1976). The statement "[a]vailable space is going" is neither an opinion nor a loose general statement commending any wares of the shopping center. It is a clear statement of fact. Available space was either going fast or it was not. And in our case, as Sofos testified in deposition, it was not.

be 80 to 85 percent occupied. And whatever opportunities offered to us, that's what some of the tenants coming. I mean not the big company, but there is a small company; you could find from the other tenants. They are still there, some tenants.

[POMARE:] Did he tell you how many leases had been signed?

[ACOPAN:] He didn't tell me exactly how many leases, but he told me it is 80 to 85 percent tenant going to be in.

[POMARE:] But he didn't tell you how many leases had been signed; is that correct?

[ACOPAN:] They are working on it.

[POMARE:] He told you that they were working on leases?

[ACOPAN:] Yes.

[POMARE:] Did he tell you that? Were these leases that were working on part of 80 percent?

[ACOPAN:] No, he didn't say that.

[POMARE:] So these were in addition to the 80 percent? Did he say that?

[ACOPAN:] No.

[POMARE:] Did he name for you any company names?

[ACOPAN:] No.

[POMARE:] Did he tell you when it would be 80 to 85 percent occupied?

[ACOPAN:] Soon.

[POMARE:] Is that what he said? Soon?

. . . .

[ACOPAN:] Yes.

It is difficult to determine, based on the preceding testimony, whether Carter told Pancakes that he was currently working on enough leases that would make the shopping center eighty to eight-five percent occupied soon, or if he simply made a prediction about what he believed the occupancy levels would be in the future. But considering the evidence in the light most favorable to Pancakes, as we must, we believe that Carter's alleged statements attempted to convey that he was currently working on enough leases that would soon result in an eighty to eighty-five percent occupancy rate at the Lahaina Shopping Center. And if that statement was in fact made, it was false.

There is an abundance of evidence in the record to support Pancakes' theory that the entire climate surrounding the leasing program—including Carter's alleged statement about occupancy rates—was rife with deception. First and foremost is the evidence indicating that the occupancy levels at the shopping center never rose above thirty-five percent, and that all involved with promoting the leasing program were well aware of these dismal occupancy levels. Patricia Perreira (Perreira) testified in her deposition that in February of 1990 the shopping center's occupancy level was twenty-nine percent:

[PANCAKES:] So the 29 percent was the amount of space that had been leased out at the Center as of that time?

[PERREIRA:] That's right.

Fleming, discussing the occupancy levels of mid-spring 1990, explained that the levels were around thirty to thirty-five percent:

[PANCAKES:] Did you ever represent to anyone else a percentage of the Shopping Center being leased out?

[FLEMING:] I don't recall representing to anyone else that the Shopping Center was leased. Maybe an executive at Liberty House, possibly during a period of mid-spring of 1990.

[PANCAKES:] And what number do you think you gave that person?

[FLEMING:] The exact number that had been leased out at the time, and that would have been probably around 30, 35 percent.

According to Spector, these percentages were readily available:

[PANCAKES:] Weren't there reports prepared periodically showing the number of leases that were signed?

[SPECTOR:] Internally, yes.

[PANCAKES:] Weren't those routinely done?

[SPECTOR:] Updated whenever a signed lease had been executed.

[PANCAKES:] So, at any given time, you wouldn't have to go back and look at the leases. You would just look at the docu-

ment, most recent document, that showed the number of leases that had been signed?

[SPECTOR:] Correct.

. . . .

[PANCAKES:] So if anybody had called you up at any time during 1990, and asked you what percentages of the Lahaina Shopping Center's leased, all you'd have to do is look at the most recent report?

. . . .

[SPECTOR:] I would look at the report, and I would have had to made [sic] certain calculations in order to be able to determine a number to provide.

The preceding testimony clearly shows that at the time of Carter's alleged statement to Pancakes, the occupancy rates were well below eighty to eight-five percent and never approached that percentage up through the time the lease was signed on June 27, 1990. It further demonstrates that both Sofos and Carter at all times during the negotiations had access to the precise occupancy rates of the center. When the preceding facts are considered in light of the enormous difficulty Sofos had attracting potential tenants, *see infra* part II.B.4, Carter's alleged statement about working on an abundance of leases was patently false.

A memorandum from Carter to Spector on June 20, 1990 sheds further light on the veracity of Carter's representations to Pancakes. In the memorandum, Carter explains his negotiating strategy with Pancakes and other potential tenants. Before we discuss the specifics of the memorandum, however, we must first address the contention of Sofos and Carter that the memorandum is not admissible evidence and thus should not be considered part of Pancakes' response to the motion for summary judgment. They "raised a timely objection to consideration of the [memorandum] before the Circuit Court, since the [memorandum] was not authenticated and constituted hearsay." But the trial court failed to rule on the objection. They nevertheless argue that "exhibits submitted in connection with a motion for summary judgment must be admissible in evidence." We agree in part.

Our rules of civil procedure do indeed require that the facts stated in affidavits supporting or opposing motions for summary judgment be admissible in evidence: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." HRCP Rule 56(e); *accord Pacific Concrete Fed. Credit Union v. Kauanoe,* 62 Haw. 334, 336, 614 P.2d 936, 938 (1980) ("[HRCP Rule 56(e)] requires that facts set forth in the affidavits be admissible in evidence. All papers referred to in the affidavits must also be attached and sworn to or certified.").

In 1984, the Hawai'i Supreme Court clarified HRCP Rule 56(e) and established the test that must be applied by trial courts:

We think that the test that should be applied by the trial level judge on a motion for summary judgment to evidence, properly certified and before the court, offered in opposition to the motion, is whether, under the rules of evidence, *it may* at trial prove to be admissible. No such test has yet been applied to this evidence.

*Myers v. Cohen,* 67 Haw. 389, 395, 688 P.2d 1145, 1150 (1984) (emphasis added). The court in *Myers* faced a scenario that is identical to ours. Specifically, a motion for summary judgment was filed; evidence that allegedly violated a rule of evidence (offers of compromise or settlement) was submitted with the plaintiff's motion in opposition to the motion for summary judgment; and the trial court failed to rule on the admissibility of the evidence at the hearing.

In reversing our decision in *Myers,* which had affirmed the trial court's grant of the defendant's summary judgment motion, the supreme court explicitly acknowledged that the evidence had not been ruled on by the trial court. The court stated: "Again, the matter of admissibility of [the] statements . . . has yet to be ruled on at the trial level." *Id.* at 396–97, 688 P.2d at 1151. After reviewing the record in the case, the court then *sua sponte* went through its own analysis of the alleged inadmissible evidence and con-

cluded that "there is certainly enough on the record as it stood before the judge hearing the motion for summary judgment to raise a genuine issue of material fact as to whether [the] conduct complained of in the complaint was or was not done with malice." *Id.* at 397, 688 P.2d at 1151. In a footnote at the end of the opinion, the court reiterated that the test is whether evidence supporting the motion may prove to be admissible at trial: "We, of course, are not implying that the evidence relied upon by the appellant is true or will be proved at trial. We are saying that appellant produced enough *apparently admissible evidence* in opposition to the motion for summary judgment to prevent its being granted." *Id.* at n. 1, 688 P.2d at 1151 n. 1 (emphasis added).

 Applying the *Myers* test, we believe that the statements made by Carter in the disputed memorandum may prove to be admissible at trial as an admission by a party opponent. Under our rules of evidence, "[a] statement that is offered against a party and is (A) the party's own statement, in either the party's individual or a representative capacity, or (B) a statement of which the party has manifested the party's adoption or belief in its truth" are admissible as exceptions to the hearsay rule. Hawai'i Rules of Evidence (HRE) Rule 803(a)(1). Carter's statements should have little trouble hurdling HRE Rule 803(a)(1) at trial for three reasons:[11] (1) Pancakes received the memorandum from the files of Sofos during discovery; (2) there is no claim that the memorandum is not authentic; and (3) Pancakes told the trial court during the summary judgment hearing that it would "get Mr. Carter[, who has moved to the mainland,] and have him go over this specific document." Consequently, although we are not implying that the statements in the memorandum are true or will

be proven true at trial, we do hold that the memorandum is apparently admissible under HRE Rule 803(a)(1).[12]

Turning now to the specific statements in the Carter memorandum, there are two sets of statements that discuss Carter's tactics with Pancakes. The first talks about his attempts to create a sense of urgency:

> As leasing agent, I try to develop a sense of urgency with the prospects in making an informed decision promptly before "someone else takes the space." This served us well with Wet Seal, Madeline, Michael's Gallery, The T-Shirt Factory and now the Pancake House. This operator has already lined up a contractor.

The second passage illustrates Carter's knowledge that the leasing program was not only faring poorly, but that people other than the landlords and agents knew about the problems:

> My proposal to her on May 11th was $2.00 per square foot for 2 years, $3.00 per square foot for 3 years with the last 5 years renegotiated. This was a little presumptuous in [sic] my part. However I needed to show some willingness on the landlord's part to recognize the risk of operating in a half vacant center and the cost of her initial start up. I wanted her to make her decision as soon as possible before she hears all the negative gossip she will get when she visits the center.

When viewed in the light most favorable to Pancakes, Carter's statements demonstrate that he could have very well made false statements about (1) the amount of actual space available and (2) the amount of leases that he was currently working on. His attempt to create a sense of urgency (even though approximately seventy percent of the

---

11. This is apparently the strategy that Pancakes planned to use at trial, given its reply brief statement that the memorandum is an "admission by a party and therefore ... does not constitute a hearsay matter."

12. The trial court apparently slumbered on the admissibility of Carter's memorandum. As we explained two years ago, however, it is the trial court's responsibility to handle these kinds of matters before ruling on a motion for summary judgment: "as a matter of good judicial adminis-

tration, the circuit courts should ascertain whether a foundation has been established for the admissibility of evidence offered in support of the motion before an order granting summary judgment is filed." *Fuller v. Pacific Medical Collections, Inc.,* 78 Hawai'i 213, 224, 891 P.2d 300, 311 (App.1995). Moreover, trial courts should not shelve these kinds of rulings and burden appellate courts with the task of making *sua sponte* predictions about potential evidence.

shopping center space was available) and quickly consummating the deal before Pancakes heard about the leasing problems, were, simply put, deceptive.

Carter's statements, when considered in conjunction with representations made by both he and Spector to other tenants, add to the subterfuge surrounding the leasing program.[13] For instance, a number of other tenants testified that they were given concrete statements about current occupancy rates that were well above the actual thirty to thirty-five percent rate. One of those tenants was Stephen Parmentier (Parmentier), who negotiated with Spector. He testified in his deposition that he was told the center was sixty-five percent leased in 1990:

> [POMARE:] Is it your testimony that D. [sic] Spector told you that the Center was 65 percent leased?
>
> [PARMENTIER:] Yes.
>
> [POMARE:] And is it your testimony that that representation was made on or about February 10, 1990?
>
> [PARMENTIER:] In there. A little bit later, possibly.

Bruce Chadwick (Chadwick), another tenant of the center, gave a witness statement stating that he was told by an agent of Pomare Properties that the center was seventy percent leased in 1990:

> [CHADWICK]: ... [I]t was represented to me that the center was 70% leased when I was in negotiations with [a leasing agent of Pomare].

Still another tenant, Amelia Poston (Poston), was told by Carter that the center was practically sold out:

> [COUNSEL:] Do you recall anything else that he actually told you about the Center?
>
> [POSTON:] He told me that the Center was practically sold out on the leases.

[COUNSEL:] Now, did he use those words, "practically sold out"?

[POSTON:] Well, he said, like, 60, 70 percent, I don't recall. Somewhere around there. And for me to go ahead and get going because I was going to lose the space requested.

. . . .

[COUNSEL:] When he said 70 percent, 70 percent what?

[POSTON:] Of the buildings. And he showed me, actually, a photograph of the spaces in the buildings that they were going to have certain designer people, and then the others, and where the restaurants were going to be in the middle. Like a food court.

Eric Westerlund (Westerlund) claimed that Spector told him the center was seventy-five percent leased:

> [COUNSEL:] What did she tell you about the tenants who had signed leases in the Center?
>
> [WESTERLUND:] Again, she said it was 75 percent leased. She said that they had just turned down Louis Vitton from coming into the Center because they didn't approve of their design plans for their store, which I thought was peculiar because they gross about a million dollars a month in Ala Moana.

Given that the landlord and agents knew that the center was never more than thirty-five percent leased, the preceding representations were untruthful.

■ We do clarify that mere predictions about occupancy rates certainly do not satisfy the past or present fact requirement of fraud. When viewing the totality of the circumstances of this case in the light most favorable to Pancakes, however, we cannot clearly say that Carter's statements to Pan-

---

13. Although Diane "Dee" Spector (Spector) was an employee of Pomare Properties, she worked closely with Sofos and Carter during the negotiation process. Her alleged representations, which were included as evidence supporting Pancakes' motion in opposition to the motion for summary judgment, bolster Pancakes' contention that specific representations about existing occupancy levels were made by Carter. Pomare Properties did not contest the relevancy of Spector's statements either in the proceedings below or in its appellate brief. Consequently, in fulfilling our duty to consider all of the evidence submitted in the light most favorable to Pancakes, we view Spector's alleged representations as relevant evidence that Carter may have made similar representations.

cakes about the occupancy levels were predictions and did not relate to past or present facts. " 'It is well settled that summary judgment should not be granted unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances....' " *Island–Gentry Joint Venture v. State,* 57 Haw. 259, 267, 554 P.2d 761, 767 (1976) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.,* 381 F.2d 245 (4th Cir.1967)). Thus, because the entire record does not unequivocally show that Pancakes cannot prevail under any circumstances, we hold that Carter's statements to Pancakes about the leasing program raise a genuine issue of material fact about whether fraud was committed.

4. *There are genuine issues of material fact involving Sofos' and Carter's duty to disclose the problems surrounding the leasing program.*

Pancakes finally argues that Sofos and Carter had a duty to disclose the problems with the leasing program before Pancakes signed the lease agreement. We agree.

Section 551 of the *Restatement (Second) of Torts* addresses the duty of disclosure in business transactions:

(1) One who fails to disclose to another a fact that he [or she] knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he [or she] had represented the nonexistence of the matter that he [or she] has failed to disclose, if, but only if, he [or she] is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

. . . .

(b) matters known to him [or her] that he [or she] knows to be necessary to prevent his [or her] partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he [or she] knows will make untrue or misleading a previous representation that when made was true or believed to be so. . . .

*Restatement (Second) of Torts* § 551, at 119 (1976).

Pancakes claims that Carter told Acopan that "the color brochure would give [her] all the information she needed to know about the Lahaina Center, including promotional programs, center stage entertainment, and displays, seasonal, and cultural events." Following this statement and the resulting problems with the center, Pancakes argues that "[t]he Lahaina Center's tenant mix and overall composition and promotion, as described in the color brochure, had been completely abandoned; and ... [t]here were material changes in occupancy and material disputes with tenants that would substantially affect the occupancy percentages in the Lahaina Center." Thus, they argue, Sofos and Carter "had a duty to disclose ... the truth about the Center." We agree.

Romig testified that there were significant problems with the shopping center, so much so that he cut his losses and relinquished control:

[PANCAKES:] Well, some tenants have a lot of business and some tenants had very little business. In fact, [sic] went out of business for lack of shoppers. Correct?

[ROMIG:] Correct.

. . . .

[PANCAKES:] What about the overall leasing program on filling up the Center on a percentage square footage?

[ROMIG:] What about it?

[PANCAKES:] How was that going in reaching the goal of 100 percent?

[ROMIG:] Well, you take these increments, don't you? After a period of time of trying to lease a center and we didn't have the tenants, it was going very poorly. That's why I turned the Center back to Weinberg.

[PANCAKES:] Did he want it back?

[ROMIG:] He took it back.

We are convinced, based on the preceding testimony and all of the previously discussed testimony, that Sofos and Carter had a duty to disclose that the leasing program "was going very poorly" before the June 27, 1990 lease agreement was signed. The color brochures claiming that "available space was going fast" depicting a thriving shopping center, coupled with Carter's alleged statement about working on eighty to eighty-five percent worth of leases, may very well have helped induce Pancakes into entering the agreement. Sofos and Carter, then, had a duty to prevent those statements of fact from being misleading.

When the trial court made its ruling granting the motion for summary judgment, it did not address any duty to disclose on the part of Sofos and Carter. We believe the trial court was mistaken. Consequently, based on the foregoing discussion, we hold that genuine issues of material fact exist concerning Sofos' and Carter's duty of disclosure.

### III. *CONCLUSION*

We hold, on the record before us, that: (1) absent clear contractual language to the contrary, strangers to a contract cannot enforce a jury trial waiver provision contained in an agreement; (2) Sofos and Carter were not parties to the lease agreement and thus were barred from relying on the jury trial waiver clause; (3) genuine issues of material fact exist concerning Sofos' and Carter's representations to Pancakes about the leasing program and occupancy levels; and (4) genuine issues of material fact exist regarding Sofos' and Carter's duty to disclose the problems surrounding the leasing program. Accordingly, we vacate that part of the Second Circuit Court's October 31, 1995 judgment dealing with Sofos' and Carter's motion for summary judgment against Pancakes and striking of Pancakes' demand for jury trial, and remand the case for a trial by jury.